IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KYLIE PRUITT,

                *Plaintiff*,

    v.

T-MOBILE USA, INC. *a Delaware corporation*,

                *Defendant*.

Civil Action No. 2:23-cv-1950

Hon. William S. Stickman IV

## **MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff Kylie Pruitt ("Pruitt") filed suit against Defendant T-Mobile USA, Inc. ("T-Mobile") alleging that T-Mobile discriminated against her on the basis of religion, pregnancy, and disability. (ECF No. 1). At Counts I and II respectively, Pruitt claims that T-Mobile violated Title VII of the Civil Rights Act of 1964, 42 U.S.C § 1981 *et seq*. ("Title VII") and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951 *et seq*. ("PHRA") by failing to accommodate her and wrongfully terminating her because of her religion. (*Id.* at 11–14). At Count III, Pruitt advances a claim for sex discrimination related to her pregnancy under Title VII. (*Id.* at 15-17). T-Mobile seeks summary judgment in its favor as to all counts. (ECF No. 32). Pruitt seeks partial summary judgment in her favor as to Counts I and II. (ECF No. 35). For the following reasons, the Court will deny Pruitt's motion, deny T-Mobile's motion as to Counts I and II, and grant T-Mobile's motion as to Count III.

## I.    FACTUAL BACKGROUND

Pruitt became an employee of T-Mobile on April 1, 2020, when T-Mobile acquired Sprint Corporation, her former employer.  Pruitt worked as a major account executive ("MAE") in the small to medium business space ("SMB") in Pittsburgh.  Her primary role was to sell cellular telephone plans and other data connection devices to businesses by developing direct relationships with them through cold calls, face-to-face meetings, networking, and referrals.  She was responsible for her own territory of customers and handled accounts of 500 to 1,000 employees.  (ECF No. 37, ¶¶ 1–3); (ECF No. 42, ¶¶ 1–3).

Beginning in mid-March 2020, Pruitt began working remotely due to the COVID-19 pandemic.  (ECF No. 37, ¶ 4); (ECF No. 41, ¶ 4).  On or about August 31, 2021, T-Mobile announced the implementation of a policy that, effective September 20, 2021, would designate all badge-controlled office locations as "COVID-19 vaccinated-only office spaces" ("the Policy").  (ECF No. 37, ¶ 5); (ECF No. 41, ¶ 5).  T-Mobile reasoned that they were taking this step to "ensure [employee] safety at our offices."  (ECF No. 37, ¶ 7); (ECF No. 42, ¶ 7). However, they also announced that the "vaccine-only workspace policy" did not apply to publicly accessible spaces such as their retail stores where they would only continue to require masks for unvaccinated employees and visitors.  (ECF No. 37, ¶ 9); (ECF No. 41, ¶¶ 7, 9); (ECF No. 42, ¶ 9).  Pruitt had been working remotely for over one year when the Policy was announced, and her position was located at one of the announced "vaccination-only" workspaces.  (ECF No. 37, ¶ 11); (ECF No. 41, ¶ 11); (ECF No. 42, ¶ 11);.

T-Mobile allowed its employees to submit accommodation requests regarding the Policy. (ECF No. 1, ¶¶ 33–35).  Pruitt objected to receiving a COVID-19 vaccine on religious grounds and submitted a written religious accommodation request on September 17, 2021.  (ECF No. 37,

¶ 20); (ECF No. 41, ¶ 20). In her request, Pruitt stated that as a "Bible-believing Born Again Christian, I believe in the sanctity of human life. The Bible is very clear regarding how God feels about the unborn, as it is repeated many times that life begins at conception … therefore, it is completely unacceptable for me to receive any product that uses aborted fetal cells for testing or development … this could contradict my faith." (ECF No. 37, ¶ 21); (ECF No. 42, ¶ 21). Pruitt further stated that "vaccines contain animal parts, neurotoxins, foreign DNA, carcinogens, and hazardous substances that can be harmful to the body and I would not be honoring God by contaminating my blood with these things," referencing 1 Corinthians 16:19-20. (ECF No. 37, ¶ 22); (ECF No. 42, ¶ 22). She also stated that she has not received any vaccinations since age eighteen. (ECF No. 37-6, p. 6). Further, her children never receive vaccines because vaccines would "alter their God given immune systems" and her abortion-related concerns. (ECF No. 37, ¶ 23); (ECF No. 41, p. 8). T-Mobile does not dispute that these beliefs comprise the basis of Pruitt's religious exemption request. What it disputes is whether she sincerely held these beliefs and if they were "why she chose not to get vaccinated." (ECF No. 41, ¶¶ 21-23).

T-Mobile granted Pruitt an exemption from the requirement to return to in-person work at the office until January 1, 2022. (ECF No. 37, ¶ 35); (ECF No. 41, ¶ 35). Pruitt still had to meet certain expectations while working away from the office, including: "[a]ttend on-site customer meetings while following customer, state, and local COVID-19 guidelines" and "[m]eet all sales activity and sales performance targets." (ECF No. 37, ¶ 36); (ECF No. 41, ¶ 36). While T-Mobile is unsure of exactly how many customers Pruitt met with during this time, it is undisputed that she continued to meet with customers in-person during the accommodation period. (ECF No. 37, ¶ 38); (ECF No. 41, ¶ 38). Pruitt confirmed that she was still allowed to meet with customers while unvaccinated after the Policy was announced, and that "our managers

encouraged us to keep meeting with customers throughout the entire time." (ECF No. 37-4, p. 9).

After the Supreme Court of the United States struck down the federal vaccine mandate for large private employers,[1] T-Mobile reaffirmed on January 21, 2022, that it was "still requiring vaccination for customer-facing roles" (which still did not apply to "customer-facing" positions at its retail locations). (ECF No. 37, ¶ 40); (ECF No. 41, ¶ 40). Then, on January 28, 2022, T-Mobile set forth its requirement that employees must be fully vaccinated by April 2, 2022, and any employee who did not receive the first dose of a COVID-19 vaccine with accompanying proof by February 21, 2022, would be placed on unpaid leave. (ECF No. 37, ¶ 43); (ECF No. 41, ¶ 43).

In January 2022, Pruitt alleges that she informed her manager that she was pregnant. (ECF No. 1, ¶ 57). In addition to her religious accommodation request, Pruitt submitted two medical accommodation requests on February 11, 2022, due to her pregnancy. (ECF No. 37, ¶ 47); (ECF No. 41, ¶ 47). She included documentation from both her primary care physician and her midwife, both of whom agreed that Pruitt should not receive a COVID-19 vaccine while pregnant and breastfeeding. (ECF No. 1, ¶¶ 59, 63, 64). Pruitt's physician further stated that he believed Pruitt did not need to receive a vaccine because she had antibodies from a prior COVID-19 infection. Pruitt attached to her exemption request a record of bloodwork that confirmed the presence of SARS-CoV-2 antibodies. (*Id.* ¶¶ 60–61).

T-Mobile denied Pruitt's request for a medical accommodation on April 11, 2022, following its determination that it could not accommodate her request based on the essential function of her job and the risk of harm that her unvaccinated status posed to herself and others.

---

[1] *See generally Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, OSHA*, 595 U.S. 109 (2022).

(ECF No. 37, ¶ 48); (ECF No. 41, ¶ 48); (ECF No. 34, ¶ 54).  Pruitt was previously granted a medical leave of absence through her delivery date of September 5, 2022, and that leave was converted into twelve weeks of paid maternity leave through December 8, 2022.  (ECF No. 37, ¶¶ 49-50); (ECF No. 41, ¶¶ 49–50).

On December 8, 2022, Pruitt returned to work remotely from her home, which she alleges was approved by T-Mobile.  She proceeded to work for a week and a half until she was terminated on December 21, 2022.  (ECF No. 37, ¶ 51); (ECF No. 1, ¶ 94).  T-Mobile claims that it considered accommodations for Pruitt that did not require vaccination, but that she rejected all such accommodations.  (ECF No. 34, ¶¶ 59–60).  Pruitt claims that Zachary Cuffe ("Cuffe"), a T-Mobile senior human resources partner, testified that he did not know who, when, or how T-Mobile allegedly reached out to Pruitt about a different position.  (ECF No. 42, ¶ 59).  Cuffe was under the impression that any alleged job offer was for a temporary position, and that "it would be a pay cut" because Pruitt would not earn her previous total target compensation even with a bonus.  (*Id.* ¶¶ 59.2, 59.4).

In March 2023, Pruitt's former office location closed, and all of her former colleagues began permanent remote work.  (ECF No. 1, ¶ 31).  Additionally, in that same month, T-Mobile rescinded the Policy and no longer required employees to show proof of COVID-19 vaccination. (*Id.* ¶ 32).

## II.    STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed.  *See*

5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing the evidence. *Id.* "[R]eal questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

### III.    ANALYSIS

#### A.  Counts I and II – Religious Discrimination Claims[2]

Title VII prohibits employers from discharging or disciplining an employee because of their religion. 42 U.S.C. § 2000e–2(a)(1). "Religion" is defined as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." *Webb v. City of Philadelphia*, 562 F.3d 256, 259 (3d Cir. 2009) (quoting 42 U.S.C. § 2000e(j)). The PHRA similarly prohibits employment discrimination because of "religious creed." 43 C.S. § 953. Under both Title VII and the PHRA, employees may assert either a failure to accommodate or a disparate treatment theory of religious discrimination in employment. *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 281 (3d Cir. 2001) (citations omitted). Pruitt pleads a failure to accommodate theory.

---

[2] The United States Court of Appeals for the Third Circuit construes Title VII and the PHRA consistently. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539, n. 5 (3d Cir. 2006). Therefore, the Court will analyze Counts I and II together.

The Court uses a two-step test in assessing Pruitt's religious discrimination claim. *Smith v. City of Atl. City*, 138 F.4th 759, 774 (3d Cir. 2025). First, she must establish that "(1) [she] held a sincere religious belief that conflicted with a job requirement, (2) [she] informed [her] employer of the conflict, and (3) [she] was disciplined for failing to comply with the conflicting requirement." *Fallon v. Mercy Cath. Med. Ctr. of Se. PA*, 877 F.3d 487, 490 (3d Cir. 2017). If Pruitt can make that showing, then T-Mobile bears the burden of demonstrating that it offered Pruitt a reasonable accommodation or that accommodating her would have imposed an undue hardship. *United States v. Bd. Of Educ. For Sch. Dist. Of Phila.*, 911 F.2d 882, 886–87 (3d Cir. 1990).

### 1. A genuine dispute of material fact exists as to whether Pruitt objected to the Policy because of her religious beliefs.

No genuine dispute of material fact exists as to whether Pruitt informed T-Mobile of her religious objection to the Policy or that she was ultimately terminated for noncompliance with the Policy. At Counts I and II, the parties only dispute whether Pruitt's religious beliefs were sincere and formed the genuine basis of her objection to vaccination. The threshold question of sincerity in a religious discrimination case is whether an individual's professed belief is "truly held." *United States v. Seeger*, 380 U.S. 163, 185 (1965). Whether an individual truly holds a professed belief is a question of fact. *Id.* A court is tasked with answering the following two questions: (1) whether the beliefs professed . . . are sincerely held and (2) whether they are, in his or her own scheme of things, religious. *Id.*

T-Mobile argues that Pruitt cannot establish that her religious beliefs motivated her objections to COVID-19 vaccination. (ECF No. 33, p. 10). It characterizes her objections as "personal" and "medical," arguing that she "admitted by her own words" that they arise from her concerns about the safety and efficacy of vaccines. (*Id.* at 11). T-Mobile also describes Pruitt's

representations about her faith as an attempt to "cloak her safety objections in religion[.]" (*Id.* at 12). It cites her statement that her "body is a temple" as the kind of "vague religious statement" that the Third Circuit has repeatedly rejected as justification for vaccine refusal on purportedly religious grounds. (*Id.*). As further proof of its position that Pruitt's vaccine refusal was secular instead of religious, T-Mobile points to her usual practice of weighing the benefits of a medical treatment against its potential harm before accepting treatment. (*Id.* at 13). According to T-Mobile, religious concerns do not usually predominate when Pruitt makes medical decisions, and it argues that her religious beliefs are not part of a "comprehensive belief system" protected under Title VII. (*Id.*).

T-Mobile also contends that Pruitt's objection to COVID-19 vaccines because they contain abortion-derived fetal cell lines is not part of a comprehensive belief system. It argues that because she does not usually research whether medications she takes have a relationship to such cell lines, her alleged concern cannot be part of her comprehensive beliefs. (*Id.*). For these reasons, T-Mobile characterizes Pruitt's objection to the Policy as an "isolated moral objection" that is not entitled to Title VII protection. (*Id.* at 14). T-Mobile also argues that even if Pruitt's religious beliefs regarding COVID-19 vaccines were sincerely held and true, they did not prevent her from receiving a COVID-19 vaccine that was verifiably not derived from such cell lines, like Novavax. (*Id.*). More generally, T-Mobile argues that Pruitt's concerns about toxins and contaminants in vaccines were unfounded because she stated that she did not know whether any COVID-19 vaccines contained them. (*Id.*). T-Mobile also argues that because Pruitt eats meat and processed food, she doesn't "[check] what she puts in her body in her daily life." (*Id.* at 15).

Pruitt counters that her objection to COVID-19 vaccination is primarily religious in nature. She argues that it is "rooted in her sincere Christian beliefs that vaccines using aborted

fetal cells condone abortion and, that vaccines interfere with her God-given immune system….." (ECF No. 38, pp. 8–9). As proof and support of that belief, Pruitt cites her accommodation request, a document describing a Christian pastor's religious opposition to COVID-19 vaccination, and a document from the Michigan Department of Health describing how some COVID-19 vaccines use a historic, abortion-derived fetal cell line in production and manufacturing. (ECF No. 37–6, pp. 2–7). Pruitt also cites her decision to not vaccinate her children as proof of her general religious beliefs regarding vaccination. (ECF No. 38, p. 9). With respect to T-Mobile's argument about her ability to take Novavax to comport with her religious beliefs, Pruitt highlights her general religious objection to vaccines, her unawareness that Novavax was available, and that T-Mobile failed to inform her of its availability. (*Id.* at 11). Pruitt also notes that the denial of her religious accommodation request predated the U.S. Food & Drug Administration's emergency use authorization for Novavax. (*Id.* at 12).

When considering whether a remedy for religious discrimination is available to a plaintiff under Title VII, the Third Circuit has held that a court must determine whether an individual's beliefs "address fundamental and ultimate questions having to do with deep and imponderable matters," are "comprehensive in nature," and are accompanied by "certain formal and external signs." *Fallon*, 877 F.3d at 491 (quoting *Africa v. Commonwealth of PA*, 662 F.2d 1025, 1032 (3d Cir. 1981)). If so, then a person's views are considered religious in nature. *Africa*, 662 F.2d at 1030–31. Under *Africa*, fundamental and ultimate questions are those which characterize religions through a practitioner's adherence to and promotion of "underlying theories of man's nature or his place in the Universe." *Id.* at 1033 (citing *Founding Church of Scientology v. United States*, 409 F.2d 1146, 1160 (D.C. Cir. 1969)). "Comprehensiveness" means that a person's beliefs consist of something more than "a number of isolated, unconnected ideas[;]"

instead, they lay claim to an ultimate and comprehensive truth. *Id*. at 1035. The requirement that a religion is accompanied by "certain formal and external signs" can include indicia such as formal services, ceremonial functions, existence of clergy, structure and organization, efforts at propagation, observance of holidays, and the like. *Id*.

Whether secular or religious beliefs predominate in a religious accommodation request is a credibility question for a jury to decide. The Second, Sixth, and Seventh Circuits have recently held that a reasonable jury could infer that a plaintiff has both secular and religious objections to COVID-19 vaccination, which it could then interpret to mean that an objection to a vaccination policy was grounded in sincere religious beliefs despite concurrent secular objections. *See Gardner-Alfred, v. Fed. Reserve Bank of New York*, 143 F.4th 51, 63–64 (2d Cir. 2025) (explaining that the job of choosing between whether plaintiff is "fraudulently hiding secular interests behind a veil of religious doctrine," or whether objections to vaccination are grounded in sincere religious beliefs despite concurrent secular objections is a matter for a jury to resolve); *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1009–11 (7th Cir. 2024) (explaining that "the fact that an accommodation request also invokes or, as here, even turns upon secular considerations does not negate its religious nature"); *Sturgill v. Am. Red Cross*, 114 F.4th 803, 809–10 (6th Cir. 2024) (explaining that the fact "that there may be both religious and secular reasons for an act does not elevate the latter over the former"). Additionally, the Second Circuit has specifically held that even if a plaintiff does not usually check whether medications contain abortion-derived fetal cell lines, she can still maintain a religious claim for refusing a vaccine on those grounds. *Gardner-Alfred*, 143 F.4th at 64 (explaining that evidence of inconsistent religious practice is not dispositive because "even the most sincere practitioner may stray from time to time" (citations omitted)).

10

Neither party is entitled to summary judgment with respect to Pruitt's religious discrimination claims. Pruitt has come forth with evidence sufficient to find that her statements regarding her religious beliefs did not merely cloak otherwise secular and medical concerns. Pruitt expressly stated in her accommodation request that "as a Bible-believing Born Again Christian, I believe in the sanctity of human life." (ECF No. 37-6, p. 5). She further stated, "it is completely unacceptable for me to receive any product that uses aborted fetal cells for testing or development." (*Id.* at 6). Discrete concerns about the use of fetal cell lines in vaccine research and production are distinct from expressions of a "general moral commandment" unentitled to Title VII protection. *See McDowell v. Bayhealth Med. Ctr., Inc.*, No. 24-1157, 2024 WL 4799870, at *4, n.7 (3d Cir. 2024) (drawing a distinction between vaccination rejection for specific, abortion-related religious concerns versus non-specific religious or moral grounds). Also, because Pruitt believes that COVID-19 vaccines, and vaccines in general, contain many contaminants, she believes that she would "not be honoring God by contaminating my blood with these things." (*Id.*). Pruitt's deposition testimony further demonstrates her religious beliefs, as she and her husband do not vaccinate their children because they "don't want to alter their God-given immune systems[.]" (ECF No. 37-4, p. 4). Even if some of her objections to vaccination can be construed as secular in nature, that alone does not defeat Pruitt's claim of religious discrimination.

Unlike unsuccessful plaintiffs in the Title VII context who have obliquely referenced disconnected moral teachings, Pruitt's sincere religious beliefs satisfy *Africa*. *See Fallon*, 877 F.3d at 492 (where plaintiff's refusal of flu vaccination on grounds of "isolated moral teachings" and "general moral commandments" failed to meet *Africa* factors). Her faith demonstrably deals with fundamental and ultimate questions, as evidenced by her beliefs about the sanctity of human

life and the dignity of her and her children's bodies. Her beliefs are comprehensive in nature as they delineate a coherent worldview that comports with her professed religious faith. Her religion, Christianity, is easily recognizable by formal and external signs. Therefore, Pruitt avoids the entry of summary judgment against her. A reasonable jury could find that her objection to vaccination is grounded in a sincere religious belief.

However, Pruitt is not entitled to summary judgment in her favor. T-Mobile has adduced evidence that Pruitt's secular and medical concerns could have predominately motivated her vaccination refusal. Pruitt admitted to receiving two immunizations after the age of eighteen: Tdap (tetanus) in 2018 and RHO D immune globulin in 2020, despite stating the contrary in her exemption request. (ECF No. 34, ¶ 30); (ECF No. 39, ¶ 30). Additionally, T-Mobile points to material facts such as Pruitt's understanding that COVID-19 vaccines do not prevent transmission, that she "avoids toxins as much as she can," her concerns about cardiac issues associated with COVID-19 vaccines, and her belief that COVID-19 vaccines were rushed to market and not subjected to adequate testing. (ECF No. 44, ¶¶ 21.1, 38.1); (ECF No. 34, ¶¶ 18, 20). Although those facts do not defeat a religious discrimination claim, they do create a genuine dispute of material fact. Whether Pruitt's noncompliance with the Policy credibly rested on religious grounds must be resolved by a jury.

> 2. *A genuine dispute of material fact exists as to whether T-Mobile provided Pruitt with a reasonable accommodation.*

Title VII requires that an employer reasonably accommodate its employee's practice of religion, not just merely assess the reasonableness of a particular possible accommodation or accommodations. *Groff v. DeJoy*, 600 U.S. 447, 473 (2023) (citation omitted). However, "any reasonable accommodation" offered by the employer is sufficient to meet its accommodation obligation. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986). "Where the employer

has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship." *Id.* at 68. An offer of a lateral job transfer that eliminates a religious conflict constitutes a reasonable accommodation. *Shelton v. Univ. of Med. & Dentistry of NY*, 223 F.3d 220, 226 (3d Cir. 2000). *See also Cook v. Lindsay Olive Growers*, 911 F.2d 233, 241 (9th Cir. 1990) (offer of lateral job transfer constituted reasonable accommodation under state religious discrimination law akin to Title VII). Also, a reasonable accommodation need not be the most reasonable one in the employee's view, the one the employee suggests or prefers, or the one that least burdens the employee. *Shelton*, 223 F.3d at 225. Employers and employees are obligated to cooperate in their effort to reach an agreement as to a reasonable accommodation for an employee's religious practices. *Id.* at 227 (noting that "employer-employee cooperation is consistent with Congress's goal of flexibility in the search for a reasonable accommodation") (citation omitted)).

T-Mobile argues that it offered Pruitt a reasonable accommodation of an internal transfer to a position that did not require vaccination, but Pruitt rejected the offer. (ECF No. 33, p. 15). Cuffe explained that the proposed position could have been performed with no in-person duties and it was part of a "migration project" that lasted through the end of 2023. (ECF No. 34-7, p. 4). In contrast, Pruitt argues that T-Mobile's accommodation offer constituted a temporary position, that Cuffe confirmed that her proposed pay range in that new position would not allow her to meet her previous total target compensation as a MAE, and that the transfer "would be a pay cut" even with a bonus. (ECF No. 39, ¶¶ 59.2, 59.4). Additionally, Pruitt contends that T-Mobile failed to engage in good faith in an interactive process to explore accommodation options to determine whether it could offer her a reasonable accommodation. (ECF No. 38, p. 14).

The record is clear that T-Mobile offered Pruitt an alternative, fully remote position that did not require vaccination. Whether that position was temporary, the amount of its compensation, and the nature of T-Mobile's cooperation with Pruitt are all disputed issues of material fact. Therefore, the issue of whether T-Mobile offered Pruitt a reasonable accommodation must be resolved by a jury.

### 3. *A genuine dispute of material fact exists as to whether accommodating Pruitt would have imposed an undue hardship on T-Mobile.*

When Pruitt made her accommodation request, the undue hardship standard required a showing of "more than a de minimis" cost to an employer. *E.E.O.C. v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)). The Supreme Court has since held that an employer demonstrates an undue hardship if an accommodation creates a burden that is "substantial in the overall context of the employer's business." *Smith*, 138 F.4th at 759 (citing *Groff v. DeJoy*, 600 U.S. 447, 468 (2023)). "Undue" now means that the employer's burden must rise to an "excessive" or "unjustifiable" level. *Groff*, 600 U.S. at 469.

Because Pruitt's accommodation request predated *Groff*, T-Mobile argues that the *de minimis* standard, as established by *Hardison* and adopted by the Equal Employment Opportunity Commission, applies instead. (ECF No. 33, p. 16). That is not so. Where the Supreme Court has applied a rule of federal law to the parties before it, the Court is required to give retroactive effect to that rule in all cases still open on direct review and as to all events, regardless of whether they predate the announcement of the rule. *Harper v. Virginia Dep't of Tax.*, 509 U.S. 86, 97 (1993). Accordingly, *Groff* applies.

Under the *de minimis* standard, T-Mobile argues that providing any accommodation other than the one it offered Pruitt would have caused an undue hardship. (ECF No. 33, p. 16). In its

view, that hardship would have been more than *de minimis* because meeting with customers was an essential part of Pruitt's job and, because some customers required proof of vaccination prior to a meeting, her unvaccinated status would limit her ability to perform her duties. (*Id.* at 17). T-Mobile also cites workplace safety concerns regarding Pruitt's vaccination refusal, stating that the Policy was designed to keep its employees safe. (*Id.*). It also asserts that its office employees would have been "fearful and resistant" to return to a work environment where everyone was not verifiably vaccinated against COVID-19. (ECF No. 40, p. 18). In contrast, it describes its retail employees as having experienced a level of COVID-19 exposure that justified the inapplicability of the Policy to them. (*Id.*). T-Mobile similarly argues that a distinction existed between retail and business customers with respect to COVID-19 risks. It asserts that its retail customers were implicitly comfortable being around unvaccinated individuals because they had chosen to shop in-person. On the other hand, T-Mobile feared that an unvaccinated account executive could visit a business customer's site and cause an outbreak that would damage its business and reputation. (*Id.*).[3]

T-Mobile further maintains that its Policy was justified by its reliance on public health guidance available at the time, particularly from the U.S. Centers for Disease Control and Prevention ("CDC") and other authorities. (ECF No. 33, p. 17). Because that guidance indicated that there was greater risk in Pruitt remaining unvaccinated, T-Mobile argues that allowing her to do so would have wrought an undue hardship. (ECF No. 33, p. 18). T-Mobile also states that although it need not, it can meet *Groff*'s standard because safety concerns are an undue hardship

---

[3] Throughout the COVID-19 era, citizens, businesses, and employees were often subject to mandates that created unobvious distinctions between classes of people and places. *See e.g., County of Butler v. Wolf*, 486 F. Supp. 3d 883, 927 (W.D. Pa. 2020).

whether the standard is *de minimis* or substantial.  (ECF No. 33, p. 16, n. 7); (ECF No. 40, p. 12, n. 6).

Pruitt contends that there is a genuine dispute of material fact as to whether her decision to remain unvaccinated would have caused an undue hardship.  She highlights that retail employees, who were not subject to the Policy, had worked in retail stores that were open to the public and customer-facing daily.  (ECF No. 38, p. 20).  Pruitt asserts that T-Mobile's acceptance of some unvaccinated employees, but not others, is an acceptance of risk inconsistent with its asserted concerns regarding employee safety.  (*Id.* at 21–22).  She also argues that when she was in the office, "she did the same things as she did at home, which consisted of answering emails, prospecting, and phone calls."  (ECF No. 37, ¶ 66).  While she was granted leave to work remotely from 2020 to early 2022, Pruitt met all of her sales quotas or exceeded them.  (*Id.* ¶ 83).  Because Pruitt went to the office and met with customers on occasion, T-Mobile disputes that Pruitt worked "fully remotely" during this time.  (ECF No. 41, ¶ 83).  However, Pruitt testified that not one of her customers ever asked about her vaccination status, nor did she ever communicate to one that T-Mobile had a vaccination policy, and that "she had closed [her] largest deals ever, three or four of them . . . only virtually because they happened post COVID, and those customers just wanted to meet virtually."  (ECF No. 37, ¶¶ 57, 73).  During and after the height of the pandemic, Pruitt stated that she only had to go into her office location on two to three occasions "after it became T-Mobile."  (*Id.* ¶ 65); (ECF No. 41, ¶ 65).

An undue hardship analysis is rooted "in 'common-sense' reasoning and a keen review of the facts."  *Smith*, 138 F.4th at 775 (citing *Groff*, 600 U.S. at 471).  Included in that analysis may be a consideration of both economic and non-economic costs of accommodation to an employer. *Id.*  The safety concerns that would have made Pruitt's return to the office an excessive and

unjustifiable burden demand a credibility determination, as does T-Mobile's argument that Pruitt could not have continued to meet with customers and fulfill her duties if she remained unvaccinated. Pruitt's argument that she could have fully fulfilled her responsibilities while remaining unvaccinated also requires a credibility determination. A jury must resolve whether T-Mobile would have suffered an undue hardship if it allowed Pruitt to remain in her position unvaccinated.

### B. Count III – Pregnancy Discrimination Claim

The Pregnancy Discrimination Act ("PDA"), a 1978 amendment to Title VII, provides that "[t]he terms 'because of sex' or 'on the basis of sex'" in Title VII "include . . . because of or on the basis of pregnancy," and employers may not discriminate in the way they treat pregnancy-related inability to work. *Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 276 (3d Cir. 2024) (quoting 42 U.S.C. § 2000e(k)). Pruitt's pregnancy discrimination claim is subject to the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). As a first step, she must establish a prima facie case. *Id*. at 802. To make a prima facie case of pregnancy discrimination, Pruitt must show that (1) she was pregnant and T-Mobile knew of her condition, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) there is some nexus between her pregnancy and the adverse employment action that would permit a factfinder to infer unlawful discrimination. *Doe v. C.A.R.S. Prot. Plus, Inc*., 527 F.3d 358, 365 (3d Cir. 2008). The Court holds that Pruitt has not met this test; she has not established a prima facie case of pregnancy discrimination.[4]

---

[4] If a plaintiff makes her prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its challenged employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer does so, the burden then shifts back to the plaintiff "to show that the defendant's proffered reason is merely pretext for intentional discrimination" or

It is undisputed that Pruitt was pregnant, that T-Mobile had knowledge of her pregnancy, that Pruitt was qualified for her position as a MAE, and that her termination was an adverse employment action. However, the Court does not find a nexus between her pregnancy and her termination by T-Mobile.[5] Pruitt admitted during her deposition that she knew before informing T-Mobile of her pregnancy that she could be terminated if she refused COVID-19 vaccination, that she was treated the same as any other unvaccinated employee in a similar role, that she understood the Policy applied to everyone regardless of their religion or pregnancy status, and that she was treated the same and "actually better than" non-pregnant employees who were unvaccinated. (ECF No. 34, ¶¶ 86, 88, 89, 91); (ECF No. 42, ¶¶ 86, 88, 89, 91). T-Mobile argues that these concessions establish that Pruitt was not treated any differently than a non-pregnant individual with a similar accommodation.

---

retaliation. *Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024) (cleaned up); *Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022).

[5] As noted by the district court in *Vasoli v. Yards Brewing Co.*, LLC, Civil Action No. 21-2066, 2021 WL 2808823, at *2 (E.D. Pa. July 6, 2021):

> There are "several ways" to establish nexus – and while any one alone may be sufficiently suggestive of a causal link, causation can also be established holistically "based upon review of all proffered evidence." *Ahern v. EResearch Tech., Inc.*, 183 F.Supp.3d 663, 669 (E.D. Pa. 2016) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)); *see also Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 303 (3d Cir. 2007) ("[I]t matters not ... whether each piece of evidence ... is alone sufficient to support an inference of causation, so long as the evidence permits such an inference when considered collectively."). The "broad array of evidence [upon which] a plaintiff may rely" to establish a causal nexus includes, *inter alia*, "disparate treatment, whereby a plaintiff shows that she was treated less favorably than similarly situated employees who are not in plaintiff's protected class," *C.A.R.S. Prot. Plus, Inc.*, 527 F.3d at 366, "temporal proximity between the pregnancy and the adverse act[,]" *Ahern*, 183 F. Supp. 3d at 669 (citation omitted), a "pattern of antagonism," or facts that show an employer gave "inconsistent explanations" for the adverse action. *Farrell*, 206 F.3d at 280, 287 (internal quotation marks and citation omitted).

18

Pruitt counters that a factfinder could reasonably determine that her pregnancy influenced T-Mobile's denial of her accommodation requests. She highlights how T-Mobile cited the medical accommodation request submitted by her primary care physician but ignored the simultaneous submission by her midwife. (ECF No. 38, p. 23); (ECF No. 34, ¶ 67); (ECF No. 42, ¶ 67.1). T-Mobile informed Pruitt that it denied her request after a review by an independent medical provider because it was "not medically supported" due to the CDC and other health agencies recommending that pregnant women receive COVID-19 vaccination at the time. (ECF No. 34, ¶¶ 68-69); (ECF No. 42, ¶¶ 68-69). Pruitt's midwife disagreed with the CDC's recommendation and noted that there were no long-term studies of COVID-19 vaccines, that four out of five vaccinated patients in her practice had miscarriages, and that she could not recommend COVID-19 vaccination for the safety of Pruitt and her unborn child. (ECF No. 1, ¶¶ 67-69).

The Court finds that no genuine dispute of material fact exists as to whether Pruitt's pregnancy played a role in T-Mobile's consideration of her medical exemption request and her subsequent termination. Pruitt maintains that a jury could find denial of her pregnancy-related accommodation request "dismissive" and evidence of T-Mobile's bias against her. (ECF No. 38, p. 19). However, the record does not demonstrate any nexus between Pruitt's pregnancy and her termination. Instead, the evidence adduced is that T-Mobile accommodated Pruitt's pregnancy. (ECF No. 33, p. 19). No evidence of hostile treatment exists after she revealed her pregnancy. In fact, there is no evidence of antagonism. T-Mobile granted her leave pending the birth of her child and she received twelve subsequent weeks of paid maternity leave thereafter. (*Id.*). T-Mobile did not terminate Pruitt's employment after she informed her supervisors that she was pregnant. She was not terminated while on maternity leave. Pruitt was terminated when she

resumed working after her maternity leave and chose not to comply with the Policy. (*Id.*). No record evidence exists to support Pruitt's claim that she was treated differently due to her pregnancy.[6] T-Mobile's motion for summary judgment at Count III will be granted as Pruitt has not shown a genuine dispute of material fact as to her pregnancy discrimination claim.

## IV.    CONCLUSION

For the foregoing reasons, T-Mobile's motion for summary judgment at Counts I and II and Pruitt's motion for partial summary judgment at Counts I and II will be denied. T-Mobile's motion for summary judgment at Count III will be granted. An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

10/6/25

Dated

---

[6] Even if Pruitt had established her prima facie showing of discrimination, T-Mobile offered a legitimate non-discriminatory reason for her termination – failure to adhere to the Policy. Nothing Pruitt has come forth with establishes that T-Mobile's reason for termination was a pretext for discrimination.

20